IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 27, 2018

## STATE OF TENNESSEE v. EDWIN MILLAN

**Appeal from the Criminal Court for Bradley County**
No. 15-CR-399     Andrew M. Freiberg, Judge

## No. E2017-01053-CCA-R3-CD

The defendant, Edwin Millan, appeals his Bradley County Criminal Court jury convictions of filing a false or fraudulent insurance claim, initiating a false police report, and tampering with evidence. In this appeal, the defendant contends that the trial court erred by excluding certain evidence, that the prosecutor engaged in misconduct by failing to correct false testimony offered by a State's witness, that the trial court erred by refusing to instruct the jury that certain witnesses were accomplices as a matter of law, that the trial court erred by permitting a witness to testify as an expert, that the trial court erred by permitting certain testimony, that the trial court erred by denying the defendant's motion to dismiss the evidence tampering charge, that the evidence was insufficient to support his convictions, and that the trial court erred by ordering a fully incarcerative sentence. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Stephen M. Hatchett, Athens, Tennessee (on appeal); and John Cavett and Barry Abbot, Chattanooga, Tennessee (at trial), for the appellant, Edwin Millan.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Stephen Crump, District Attorney General; and Emily Petro, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Bradley County Grand Jury charged the defendant with alternative counts of official misconduct, *see* T.C.A. § 39-16-402; one count of conspiracy to file a false or fraudulent insurance claim, *see id.* §§ 39-12-103; 39-14-133; one count of filing a

false insurance claim, *see id.* § 39-14-133; one count of initiating a false police report, *see id.* § 39-16-502; and one count of evidence tampering, *see id.* § 39-16-503, related to his participation in an agreement with Steven Wayne Crisp to stage the theft of Mr. Crisp's motorcycle for purposes of fraudulently obtaining insurance proceeds. The trial court dismissed the first two counts, and the case proceeded to trial on the remaining counts.

At the defendant's October 2015 trial, Mr. Crisp testified that he met the defendant in 2011 when he and the defendant both purchased the same model 2011 Yamaha Stryker motorcycle at a Yamaha motorcycle dealer. He said that he and the defendant "pretty much became friends after that" and that they played golf, worked out, and rode motorcycles together.

Mr. Crisp testified that he purchased the Yamaha motorcycle, trading in a used motorcycle he owned and financing the net purchase price through Superior Financial Company. Mr. Crisp said that he made timely monthly payments on the Yamaha motorcycle until he went through a divorce. Following the divorce, he became delinquent on his payments. At that point, Mr. Crisp tried to sell the motorcycle on Craigslist, but he "owed more than it was actually worth at the time." Mr. Crisp said that he discussed his inability to sell the motorcycle with the defendant, and the defendant "said, well don't sell it, and we can take care of it and make it disappear and you won't owe anything."

Mr. Crisp testified that the defendant, who was at that time a Cleveland Police Department ("CPD") Officer, told Mr. Crisp to bring the motorcycle to Marco's Auto Concepts ("the shop") in Cleveland, which Mr. Crisp believed was owned by the defendant's "friend," on a day when the defendant was on duty. The defendant directed Mr. Crisp to "bring it to his shop and drop it off. And then go get something to eat. And then report it stolen. And he would get the call. And he would make it disappear." Mr. Crisp said that on August 2, 2013, he rode the motorcycle to the shop and that, when he arrived, the defendant was the only person there. Mr. Crisp's fiancée picked him up from the shop, and they drove to a nearby restaurant. After they finished eating, Mr. Crisp telephoned 9-1-1 and reported that the motorcycle had been stolen. A recording of Mr. Crisp's 9-1-1 call was played for the jury.

After the call was made, the defendant, who was on duty with the CPD that day, arrived to take a report of the offense. Mr. Crisp testified that the defendant told Mr. Crisp "that he'd put the report in somebody else's name since me and him were friends."

Mr. Crisp said that, after making the theft report and at the defendant's suggestion, he filed a claim for the loss of the motorcycle with GEICO insurance

company. He said that GEICO made a payment to Superior Financial but that the payment "didn't pay [the motorcycle] completely off."

Mr. Crisp acknowledged that he was granted immunity by the district attorney general in exchange for his testimony against the defendant.

Christina Hernandez testified that she "worked for" the defendant as "the supervisor" at the shop on Church Street in Cleveland from August 2014 until the shop closed. Ms. Hernandez recalled that in August 2015, the defendant asked her "to get rid of" a motorcycle frame that had been "at the body shop at the top" "since . . . before [she] started working there." She testified that the defendant said that "[h]e didn't care where it went or what happened, just get rid of it." She said that the defendant brought the motorcycle down the stairs and "scratch[ed] the VIN off of it" using "a raz[o]r blade that we use for the body work."

Approximately two days later, Ms. Hernandez returned to the shop at night, retrieved the motorcycle frame, placed it into her truck, and drove to a mountainside in Polk County, where she "threw it off the side." Afterwards, she telephoned the defendant and "told him that everything was done." The defendant told her she had done a "good job" and promised to call her later.

Ms. Hernandez said that after she "had gotten some threats that [she] was going to be framed for the robbery of this," she contacted Bill Cherry via "the drug task force line" to report what she had done at the defendant's direction. Ms. Hernandez acknowledged that she had been offered immunity from prosecution in exchange for her truthful testimony at the defendant's trial.

During cross-examination, Ms. Hernandez testified that the shop belonged to the defendant and a man named Marco Molina. She agreed that Mr. Molina was responsible for the day to day operations of the body shop as well as performing the work. She acknowledged having told defense counsel that she was afraid of Mr. Molina because she "had gotten threats" from Mr. Molina's associates. She described having received threats, having been attacked by someone wielding a baseball bat, having her car damaged, and having her apartment set afire as methods of intimidating her. She said that she "didn't know whose side" the threats "would have c[o]me from," but she reiterated that she was afraid of Mr. Molina and "his people." She acknowledged that she had telephoned the defendant to report the threats and intimidation.

At some point prior to August 2015, Ms. Hernandez reported to the defendant after Mr. Molina accused her of the thefts, that Mr. Molina was stealing money from the business. She said that, ultimately, the defendant and Mr. Molina "[s]plit" due

to "[m]oney and the differences." She recalled that Mr. Molina was not "a good boss" and that he sold vehicles that belonged to the shop but told her "not to put it on the paperwork." Ms. Hernandez said that she told the defendant about Mr. Molina's activities "because that was [her] job."

Ms. Hernandez testified that when the defendant asked her to get rid of the motorcycle frame, he told her that "there was something wrong with it," which she interpreted to mean "that it was hot." Ms. Hernandez said that the motorcycle engine was in the back of the shop on a table. She said that she was asked to dispose of the engine as well as the frame but that she "didn't know they went together" "[b]ecause there was parts all over the body shop" during the entire time she worked there. Ms. Hernandez testified that she did not know Mr. Crisp.

Ms. Hernandez recalled that after the shop closed, she and another employee helped the defendant clean the shop and that, during the cleaning process, they "loaded a lot of stuff up." Afterward, Mr. Molina asked her what had happened to the motor and the frame. She hypothesized that Mr. Molina's sudden concern was triggered when "the police came looking for the stuff" because he knew that it was stolen.

On redirect examination, Ms. Hernandez recounted a time when the defendant came to her apartment to ask why she had not responded to his text messages. She said that the defendant claimed that he was worried about her and "showed [her] a gun that he had. . . . And he said that he had the protection." On another occasion, the defendant came to Ms. Hernandez's place of work and asked her if she "was okay" and if she "had talked to anybody" or "heard anything."

Tennessee Highway Patrol ("THP") Sergeant Thomas Clower testified that he began an investigation into the disappearance of a Yamaha Stryker motorcycle in 2015 after an investigator from the District Attorney's Office for the 10th Judicial District provided him with information that led him to go "to Polk County up on Chilhowee Mountain" to look for a motorcycle frame and an engine. Upon following the directions provided, he located a motorcycle frame "off a really steep embankment." Sergeant Clower said that the frame "had nothing left on it, except for the full 17 digit" vehicle identification number, or VIN. He recalled that "there was some little bit [of] alteration, it looked like, just some scratches," but that, otherwise, the VIN was readable.

Sergeant Clower relayed the VIN to a THP dispatcher, who, in turn, checked the number in the National Crime Information Center database. The database indicated that the vehicle had been reported stolen, and Sergeant Clower retrieved the police report of the theft from the CPD. The report listed Officer Scott Criddle as the reporting officer. Sergeant Clower spoke with Officer Criddle and then listened to the

recording of the 9-1-1 call reporting the theft. He said that, upon listening to the recording, "it appeared that that wasn't Scott Criddle's voice on the radio answering the call" but was instead the defendant's. After listening to the recording, Sergeant Clower obtained the "CAD" report, which he described as "an automated dispatch log" of the 9-1-1 call that "tells the time it was . . . received, dispatched," as well as the name of the officer who responded and the time of the officer's arrival at the scene. The CAD report identified the defendant by his car number, 3355, and indicated that he had responded to the call.

Because of the discrepancies between the 9-1-1 recording, the CAD report, and the theft report, Sergeant Clower obtained the hourly time sheets for Officer Criddle and the defendant from the CPD. Those records indicated that the defendant was on duty from 6:00 a.m. until 4:00 p.m. on August 2, 2013, and that Officer Criddle was off duty that day.

At that point, Sergeant Clower interviewed Mr. Crisp. Based upon the information he received during that interview, Sergeant Clower contacted GEICO Insurance Company to obtain any records related to the theft of Mr. Crisp's Yamaha.

During cross-examination, Sergeant Clower reiterated that he did not find a motorcycle engine.

CPD Officer Scott Criddle testified that he was not on duty on August 2, 2013, that he did not investigate a motorcycle theft on August 2, 2013, and that he did not prepare a police report for a theft occurring on August 2, 2013. He said that in 2013, his radio number was 3363 and that the defendant's was 3355.

James Bowers, a representative of GEICO Insurance Company testified that Mr. Crisp filed a claim for the loss of his motorcycle on August 2, 2013. He said that, following an investigation, the company paid Superior Financial Services $8,275.67, which Mr. Bowers said was the fair market value of the motorcycle as determined by a valuation company minus Mr. Crisp's deductible. He said that the valuation company "determined the actual cash value of the motorcycle" to be $8,581.

During cross-examination, Mr. Bowers identified a "loss history" report generated by the GEICO claims department and indicated that "this loss history is usually a standard report that's run to determine does this create a red flag for further investigation."

The defendant testified that he was hired by the CPD following his honorable discharge from the Navy in 2008. He said that in 2011 or 2012, he was

-5-

approached by Mr. Molina, who was "into the paint business" with another individual that "he didn't trust" and who wanted the defendant to "help [him] get this business legitimate, to get him out of a two-car garage and into an actual building and have everything done properly." The defendant agreed to go into business with Mr. Molina, and the two men named their resulting business Marco's Auto Concepts because Mr. Molina "was the actual talent." He said that Mr. Molina was the operations manager and that they hired Ms. Hernandez in 2014. The defendant testified that the primary business of Marco's Auto Concepts was "auto body collision repair" but that the shop also provided tire service and the painting of items other than automobiles. He said, "We painted pretty much anything that we could paint, we would paint for money." He described his role as a silent partner and said that his association with the shop "was more of an investment thing for" him. He recalled that he only came to the shop occasionally because he "worked on an average of 60 to 70 hours a week at the police department."

The defendant said that he met Mr. Crisp at a local motorcycle shop when the two purchased the same type of motorcycle. He said that, after they met, he and Mr. Crisp went to the gym occasionally. The defendant recalled having seen Mr. Crisp at the shop after he asked the defendant about having some work done. The defendant said that he directed Mr. Crisp to Mr. Molina and that, on several occasions thereafter, he drove by the shop while on duty and saw both Mr. Crisp and Mr. Crisp's girlfriend there at the shop.

The defendant testified that in its first year, the shop "did moderately well" financially but that "after that it started to dwindle." In addition, the defendant began to observe accounting discrepancies at the business. The defendant said that he eventually severed his business relationship with Mr. Molina and that, afterwards, he was forced to close the location because the building's owner increased the rent. He testified that, in the process of cleaning out the building, the loft was emptied of its contents. He said that "everything was placed in a big pile in the middle of the bay" and then "loaded into a trailer and taken to the city dump." The defendant insisted that he told everyone working for him "that all these items needed to be taken . . . to the dump and disposed of."

The defendant recalled having seen the Yamaha motorcycle frame when he removed items from the loft area. He said that, at the time, he did not realize that the motorcycle frame had belonged to Mr. Crisp. He denied asking Ms. Hernandez to make the frame disappear, saying, "What I advised Ms. Hernandez was, is to have the entire place cleaned up, placed in the trailer that we provided, and take it to the dump." He said that Ms. Hernandez did not comply with his request and that "[t]he only two items that were removed were a motor and that frame."

The defendant acknowledged that he was the first officer to respond to Mr. Crisp's 9-1-1 call reporting the theft of the motorcycle but said that "midway through the call, Officer Criddle showed up on scene" in his patrol car. At that point, he said, he "turned over all information that [he] had gathered over to Officer Criddle." The defendant adamantly denied having prepared or submitted the report of the theft of Mr. Crisp's motorcycle and said that he had not even seen the report until charges were levied against him in this case. He insisted that he could not have generated a report using Officer Criddle's name because two unique passwords were required to generate a report, and he did not know Officer Criddle's passwords. The defendant said that he did not "believe that you can put another officer's name on your report, unless you are adding him as a secondary unit to that report."

The defendant denied telling Mr. Crisp that he could make the motorcycle disappear, assisting Mr. Crisp in making a false insurance claim, making a report on the theft, directing the disposal of the motorcycle, or even knowing that Mr. Crisp's motorcycle was stolen prior to the issuance of the present indictment.

In rebuttal, Sergeant Clower testified that he asked the CPD to provide him with a copy of every CAD report from August 2, 2013, that involved Officer Criddle and that he had received none. Sergeant Clower, an officer with more than 27 years' law enforcement experience, testified that it was not common for police officers to exit their vehicles on a dispatch call without informing the dispatcher. He said that the dispatcher needs to know "who's taking the call," "who is in charge of the call," "who was going to be making the report," and "when [an officer] finished with a call . . . and [is] available for other calls." He said that all of that information is then recorded into the CAD report and that, had Officer Criddle radioed in that he had completed the call and would be preparing the report, the information would have been included in the CAD report.

Based upon this proof, the jury convicted the defendant of filing a false or fraudulent insurance claim for property valued at more than $1,000 but less than $10,000; initiating a false police report; and evidence tampering. Following a sentencing hearing, the trial court imposed concurrent sentences of three years for each of the convictions.

The defendant filed a timely but unsuccessful motion for new trial followed by this timely appeal. In this appeal, the defendant contends that the trial court erred by excluding evidence related to other insurance claims filed by Mr. Crisp, by refusing to instruct the jury that Ms. Hernandez and Mr. Crisp were accomplices as a matter of law, by permitting Sergeant Clower to testify as an expert on the protocols used by the THP, by permitting Ms. Hernandez to testify that she had seen the defendant with a gun, and by denying his motion to dismiss the charge of evidence tampering. He also challenges the

State's failure to correct false testimony provided by Mr. Crisp and the sufficiency of the convicting evidence.

## I. Mr. Crisp's Prior Insurance Claims

The defendant first asserts that the trial court erred by prohibiting him from introducing extrinsic evidence of other insurance claims filed by Mr. Crisp to impeach his testimony given during direct examination that he had filed only one insurance claim other than the one at issue in this case. The State asserts that extrinsic evidence of the additional insurance claims was not admissible because the defendant did not confront Mr. Crisp with the claims and that, in consequence, the trial court did not err.

During the cross-examination of Mr. Crisp, the defendant asked Mr. Crisp whether he had filed insurance claims other than the one he filed for the loss of the motorcycle in this case, and Mr. Crisp said that he had filed one additional claim for the theft of his truck. He explained that, because the truck was returned to him at some point, he did not pursue the claim.

During the cross-examination of Mr. Bowers, Mr. Bowers identified a "loss history" report generated by the GEICO claims department and indicated that "this loss history is usually a standard report that's run to determine does this create a red flag for further investigation." The defendant tried to establish, via the use of the "loss history" report, that Mr. Crisp had filed loss claims in addition to the one for his Yamaha motorcycle and the one for his truck that Mr. Crisp acknowledged during his cross-examination. The State objected to this form of impeachment because the defendant did not specifically ask Mr. Crisp about the additional claims when he was on the stand. The trial court agreed with the State and ruled that the defendant would not be permitted to present extrinsic evidence of the additional claims because he had not afforded Mr. Crisp "an opportunity to affirm or deny" having made the claims. The court concluded that the other claims were not relevant to any other issue.

During an offer of proof, Mr. Bowers testified that the loss history indicated that, in addition to the claim filed for the loss of the Yamaha motorcycle, the defendant had filed a claim with GEICO for the theft of a vehicle on May 17, 2012, and with America Banker's Insurance for the theft of personal property on October 26, 2012.

Both at trial and on appeal, the parties asserted evidence rule 613 as the avenue for admission of the loss history report and any testimony from Mr. Bowers related thereto. Using Rule 613 as the vehicle of admission, we easily conclude that the trial court did not err by excluding the evidence because "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is

afforded an opportunity to explain or deny the same." Tenn. R. Evid. 613(b); *see State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998) (confirming that "extrinsic evidence remains inadmissible until the witness either denies or equivocates as to having made the prior inconsistent statement"); *see also* Tenn. R. Evid. 803(26), Advisory Comm'n Comments ("To be considered as substantive evidence the statement must first meet the traditional conditions of admissibility which include the procedural aspects of inconsistent statements as addressed in Rule 613. This reference also makes clear that only prior inconsistent statements, and not consistent statements, are within the ambit of this rule."). Although the defendant asked Mr. Crisp whether he had filed any additional insurance claims, he did not confront Mr. Crisp with the two specific claims at issue.

In our view, the parties are mistaken as to the evidentiary rule at issue. The loss history report does not qualify as a prior inconsistent statement by Mr. Crisp because it is not a statement made by Mr. Crisp. At most, it is proof that Mr. Crisp filed additional insurance claims, contrary to his testimony that he had filed only one other claim. Thus, the true nature of the use of the loss history report was to impeach Mr. Crisp through fact contradiction, a device that is recognized by our courts. *See, e.g.*, *State v. Jeremy Sims and Sherry Brookshire*, No. W2013-01253-CCA-R3-CD, slip op. at 20 (Tenn. Crim. App., Jackson, Sept. 25, 2015); *see also, e.g.*, *State v. McKinney*, 74 S.W.3d 291, 317 (Tenn. 2002) (appendix). Fact contradiction is a long-standing impeachment device that is indigenous to cross-examination and enjoys implied currency in our rules of evidence; it emanates simply from the power to attack a witness's credibility as expressed in Tennessee Rule of Evidence 607. *See* Neil P. Cohen et al., *Tennessee Law of Evidence* § 6.07[4][a] (6th ed. 2011). Through fact contradiction, a cross-examining party inquires about facts that conflict with the witness's testimony to show indirectly that the witness is untruthful.[1] *See id.* Because the defendant did not advance fact contradiction as the avenue of impeachment, however, any such claim is waived on appeal.

## II. False Testimony

The defendant claims entitlement to a new trial on grounds that the State permitted Mr. Crisp to give false testimony with regard to the number of prior insurance claims he had filed and compounded the error by objecting to the defendant's attempt to challenge the false testimony, thereby violating principles of due process. The State contends that the defendant waived plenary review of this claim by failing to present it in

---

[1] In addition to its value as a tool of impeachment, "when evidence contradicts material, adjudicative facts, the real efficacy of the evidence is substantive fact rebuttal that *incidentally* impeaches a fact or fact witness. In other words, when 'fact contradiction' evidence is relevant to the issues on trial, it is generally admissible as substantive evidence." *McKinney*, 74 S.W.3d at 317 (appendix) (citations omitted).

his motion for new trial. We agree. *See* Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in . . . [any] ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."); *see also State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial but were not raised in the motion); *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989).

Although this court may, "[w]hen necessary to do substantial justice, . . . consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial," Tenn. R. App. P. 36(b), it is our view that this claim does not satisfy the criteria for plain error review. This court will grant relief for plain error pursuant to Rule 36(b) only when:

> "(1) the record clearly establishes what occurred in the trial court; (2) the error breached a clear and unequivocal rule of law; (3) the error adversely affected a substantial right of the complaining party; (4) the error was not waived for tactical purposes; and (5) substantial justice is at stake."

*State v. Cooper*, 321 S.W.3d 501, 506 (Tenn. 2010) (quoting *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010)). The record does not establish that a clear and unequivocal rule of law was breached because no evidence suggests that the State intentionally suborned perjured testimony. Moreover, nothing suggests that the defendant did not waive the issue for tactical reasons, choosing to forego a relatively weak issue in favor of other, stronger issues in his motion for new trial. Finally, Mr. Crisp's testimony about his filing of other insurance claims was not so vital to the case as to implicate principles of substantial justice.

### III. Accomplice Instruction

The defendant next contends that the trial court erred by refusing to instruct the jury that Ms. Hernandez and Mr. Crisp "were accomplices as a matter of law and failing to give *Bolden* instructions regarding the accomplice testimony procured by a plea agreement." Again, the State contends that the defendant has waived this issue by failing to raise it in his motion for new trial, and, again, we agree with the State. *See* Tenn. R. App. P. 3(e) ("[N]o issue presented for review shall be predicated upon error in . . . jury instructions granted or refused . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."). Additionally, we conclude that the defendant has failed to satisfy the criteria for plain error review of this issue.

-10-

The defendant asked the trial court to provide the following jury instruction on accomplice testimony:

> An accomplice is a person who joins another person in committing a crime. The accomplice must do so knowingly, voluntarily and sharing the intent of the other person in doing the crime.
>
> In this case the Court charges you that the following witnesses, Marco Molina, Steven Wayne Crisp and Christina Hernandez were accomplices in the alleged crimes. The testimony of an accomplice by itself cannot convict the Defendant. The accomplice's testimony must be supported by other evidence. This other evidence must independently lead to the conclusion that a crime was committed and that the Defendant was involved in it. This other supporting evidence must connect the Defendant to the crime.
>
> The supporting evidence may be direct or circumstantial and it need not be sufficient by itself to justify a conviction. The supporting evidence is enough if it fairly and legitimately tends to connect the Defendant with the crime charged.
>
> It is for you, the jury, to decide whether an accomplice's testimony has been sufficiently supported by the evidence.

The State objected to the special instruction but indicated that it had no objection to the trial court's giving the pattern instruction on accomplice testimony. The court stated that it was hesitant to provide the defendant's special instruction because it said "the Court finds them to be an accomplice." The court provided the following instruction in its charge to the jury:

> Evidence of accomplice: An accomplice is a person who joins another person in committing a crime. The accomplice must do so knowingly, voluntarily and sharing the intent of the other person in doing the crime.
>
> In this case you heard from witnesses, Steven Wayne Crisp and Christina . . . Hernandez. . . . If you find either or both witnesses to have been accomplices in any or all of the charged offenses, you must find there to be independent

-11-

corroboration in any such crime involving an accomplice before returning a verdict of guilty.

The testimony of an accomplice by itself cannot convict the defendant. The accomplice's testimony must be supported by other evidence. This other evidence must independently lead to the conclusion that a crime was committed and that the Defendant was involved in it. This other supporting evidence must connect the defendant to the crime.

The supporting evidence may be direct or circumstantial and it need not be sufficient by itself to justify a conviction. The supporting evidence is enough if it fairly and legitimately tends to connect the defendant with the crime charged.

It is for you, the jury to decide whether an accomplice's testimony has been sufficiently supported by the evidence.

The only difference between the instruction provided by the trial court and that requested by the defendant was that the trial court declined to instruct the jury that, as a matter of law, both Ms. Hernandez and Mr. Crisp were accomplices. "When the facts concerning a witness's participation are clear and undisputed, the trial court determines as a matter of law whether the witness is an accomplice." *State v. Robinson*, 146 S.W.3d 469, 489 (Tenn. 2004) (citing *Ripley v. State*, 227 S.W.2d 26, 29 (1950); *State v. Perkinson*, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992)). When "the facts are disputed or susceptible to different inferences," however, the determination of whether the witness is an accomplice is a question for the trier of fact. *Robinson*, 146 S.W.3d at 489 (citing *Perkinson*, 867 S.W.2d at 7); *see also Conner v. State*, 531 S.W.2d 119, 123 (Tenn. Crim. App. 1975). "The test generally applied is whether the witness could be indicted for the same offense charged against the defendant." *Robinson*, 146 S.W.3d at 489 (citing *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964)).

Because the State established that Mr. Crisp fully participated in the filing of the falsified police report and the fraudulent insurance claim, the trial court should have instructed the jury to consider him an accomplice as a matter of law with respect to those charges. That being said, because other evidence sufficiently corroborated his testimony, the error was harmless. As to Ms. Hernandez, although she testified that she suspected that the items were stolen when the defendant asked her to dispose of them, the evidence did not clearly establish that she knew that an investigation was either pending or in progress. Consequently, it was appropriate for the trial court to leave the

determination whether Ms. Hernandez was an accomplice to the jury. Under these circumstances, the defendant has not established that the error affected a substantial right.

As to the defendant's claim that the trial court failed to instruct the jury, as required by *State v. Bolden*, 979 S.W.2d 587 (Tenn. 1998), that it should carefully consider the impact of the grant of immunity on the testimony provided by Ms. Hernandez and Mr. Crisp, we first observe that the defendant did not request any special instruction of this nature prior to trial, did not lodge a contemporaneous objection to the absence of such an instruction from the trial court's charge, and failed to raise the issue in his motion for new trial. In consequence, it is waived. Moreover, the record establishes that the trial court provided the following instruction as part of its general charge:

> You, as jurors, are to determine and judge the facts, evidence, and testimony presented in this case, and the weight, impact, and effect of that proof on the issues presented for your deliberation during this trial.
>
> You are also the exclusive judges of the credibility of the witnesses and the weight to be given to their testimony. . . . In forming your opinion as to the credibility of a witness, you may look to the proof, if any, of any of the following things: One, his or her general character; two, the evidence, if any, of the witness's reputation for truth and veracity; three, the intelligence and respectability of the witness; four, his or her interest or lack of interest in the outcome of the trial; five, his or her feelings; six, his or her apparent fairness or bias; seven, his or her means of knowledge; eight, the reasonableness of his or her statements; nine, his or her appearance and demeanor while testifying; ten, his or her contradictory statements as to material matters, if any are shown; and all the evidence in the case tending to corroborate or to contradict him or her.

This instruction is identical to the instruction cited with approval in *Bolden*. *See State v. Bolden*, 979 S.W.2d 587, 591 n.2 (Tenn. 1998).

## *IV. Expert Testimony*

The defendant argues that the trial court erred by permitting Sergeant Clower to provide expert testimony on the protocols followed by the THP because the testimony was outside the witness's scope of knowledge and because the testimony was

cumulative. The State contends that the issue lacks merit because Sergeant Clower did not testify as an expert and because the testimony was "moderately redundant" but not cumulative.

Following the defendant's testimony, the State called Sergeant Clower to rebut the defendant's testimony that Officer Criddle had responded to Mr. Crisp's 9-1-1 call and prepared the police report of the theft of the motorcycle. During his rebuttal testimony, Sergeant Clower, testified that, based upon his more than 27 years' law enforcement experience, it was not common practice for police officers to exit their vehicles on a dispatch call without informing the dispatcher. He explained that it is important for officers to inform the dispatcher of their whereabouts. Importantly, Sergeant Clower was not qualified as an expert in law enforcement protocol but merely testified based upon his own personal experience. *See* Tenn. R. Evid. 701(a) ("If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue."). Additionally, Sergeant Clower did not specifically provide testimony about the protocols followed by the CPD, a matter that would have arguably been outside his personal knowledge, *see* Tenn. R. Evid. 602, but as to the protocols followed by the THP. Finally, because Sergeant Clower had not provided this testimony before he was called in rebuttal, it cannot be classified as cumulative. *See* Tenn. R. Evid. 403.

## *V. Ms. Hernandez's Testimony*

The defendant next asserts that the trial court erred by permitting Ms. Hernandez to testify that the defendant had displayed a handgun to her, arguing that the testimony was barred by evidence rule 404(b). The State avers that the defendant has waived appellate consideration of this issue by failing to raise it in his motion for new trial and that, because the trial court did not err by admitting the evidence, the issue does not qualify for plain error review. We agree with the State.

As indicated above, the failure to present an issue for which the remedy is a new trial in a timely-filed motion for new trial precludes appellate review unless the issue satisfies the criteria for plain error review. This issue does not.

After the defendant questioned Ms. Hernandez about her fear of Mr. Molina and the threats she had received from Mr. Molina and "his people," the State questioned Ms. Hernandez about threatening behavior by the defendant. The defendant objected, and the trial court partially sustained the objection, ruling that Ms. Hernandez would only be permitted to testify about two occasions on which the defendant confronted her

personally about the case. Subsequently, Ms. Hernandez testified that on one occasion the defendant came to her place of work, expressed concern for her, and asked her whether she had spoken to anyone about the case. On another occasion, the defendant came to her apartment after she failed to respond to several text messages from him. He again expressed concern for her and then showed her a handgun that he said he had for "protection." Given that Ms. Hernandez did not testify that the defendant had threatened her or that he had brandished the firearm at her, her testimony that the defendant possessed a firearm does not qualify as inadmissible evidence of a prior bad act. *See* Tenn. R. Evid. 404(b). In consequence, the trial court did not breach a clear and unequivocal rule of law by admitting the testimony. *See Cooper*, 321 S.W.3d at 506 (stating that plain error review is appropriate when, among other things, "the error breached a clear and unequivocal rule of law").

### VI. *Motion to Dismiss/Sufficiency of the Evidence*

In his next claim for relief, the defendant contends that the trial court erred by denying his motion to dismiss the evidence tampering charge in this case. The State asserts that the defendant has forfeited review of this issue by failing to raise it in his motion for new trial. We disagree. First, the defendant filed a freestanding motion raising this issue following the jury verdict but before the sentencing hearing, and, although not framed as a motion for new trial, the motion was in the nature of a renewed motion for judgment of acquittal and was treated as such by the trial court. Second, because the remedy, should the defendant's claims prove meritorious, would not be a new trial but would instead be the dismissal of the charge, the defendant need not have raised the issue in a motion for new trial to preserve it for appellate review.

Immediately following his trial, the defendant filed a motion to dismiss his conviction of evidence tampering, arguing that the evidence presented by the State failed to satisfy the elements of the offense. Specifically, the defendant claimed that the State failed to establish that the defendant's disposal of the motorcycle frame and motor, which was the basis of the evidence tampering charge, occurred after the defendant was aware that an investigation into the disappearance of Mr. Crisp's motorcycle was underway.

The trial court heard the defendant's motion just prior to the sentencing hearing. The defendant argued that "it's undisputed that the disposal of the motorcycle frame, which is the tampering, took place before the investigation began. And it's pretty obvious because the investigation began with Christina Hernandez" reporting the disposal. He added that because the crime occurred before the investigation began, "it would be impossible for the defendant to have disposed of that frame knowing that an investigation was going on when it hadn't started yet." The defendant also argued that that count of the indictment charging evidence tampering was deficient because it did not

-15-

provide "the date that the investigation began and the date or time frame in which the State believed the crime was committed."

The State, citing Tennessee Rule of Criminal Procedure 12, argued that the defendant waived any challenge to the sufficiency of the indictment by failing to make his challenge prior to trial. As to the defendant's claim that the State failed to establish that the defendant disposed of the motorcycle frame after he knew that an investigation was in progress, the trial court observed that the statute "talks about an investigation pending or in progress. Pending or in progress." The court opined that the defendant was "merging those two potential alternatives in the sense that while it is certainly true that this Court . . . or any reasonable juror, would have difficulty determining when the investigation was afoot, so to speak, and actively being pursued," the State had presented sufficient proof "upon which a reasonable juror could have rested a verdict of guilty as to Count Five, that being the initial false report of the motorcycle itself." The court explained, "[W]hen a report is made of a stolen motorcycle to police, and a response is made, well, that's the beginning of an investigation, or at a minimum, that an investigation is pending." The court noted that an investigation could be pending "[w]hether or not it was in progress."

The trial court concluded that the indictment was sufficient to charge the defendant with evidence tampering and that no further narrowing of the time frame within that count was constitutionally necessary.

In this appeal, the defendant argues that the trial court should have granted his motion to dismiss the evidence tampering charge because a fatal variance occurred between the indictment and the proof offered at trial. The record is clear, however, that the defendant has raised his claim of variance for the first time on appeal, and, in consequence, that claim is waived. *See State v. Johnson*, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996) ("Issues raised for the first time on appeal are considered waived."); *see also* Tenn. R. App. P. 36(b); *State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988); *State v. Rhoden*, 739 S.W.2d 6, 11 (Tenn. Crim. App. 1987); *State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987). Additionally, because the record establishes that there was no variance between the indictment and the proof, the defendant cannot establish the prerequisites for plain error review. The indictment alleged that, between August 1 and 31, 2015, the defendant "did unlawfully and knowing that an investigation or official proceeding was pending or in progress, alter, destroy or conceal any record, document or thing, with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding." This language tracks the language of Code section 39-16-503, and the evidence adduced at trial established that, in August 2015, the defendant removed the motorcycle frame from the attic of the shop, scratched at the VIN, and directed Ms. Hernandez to "just get rid of it."

Moreover, a close review of the defendant's claim reveals that, like his original claim, the defendant's claim is really more of a challenge to the sufficiency of the evidence supporting his conviction of evidence tampering. We will consider this claim along with the defendant's challenge to the sufficiency of the evidence for his other convictions.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

## *A. Evidence Tampering*

As charged in this case, "[i]t is unlawful for any person, knowing that an investigation or official proceeding is pending or in progress, to . . . [a]lter, destroy, or conceal any record, document or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding." T.C.A. § 39-16-503(a). As indicated, the indictment alleged that the defendant engaged in conduct that qualified as evidence tampering in August 2015. The only proof of any act that would satisfy the elements of the statute was the defendant's attempting to alter the VIN number and then engaging Ms. Hernandez to dispose of Mr. Crisp's motorcycle engine and frame during August 2015. The defendant, citing Ms. Hernandez's call to the district attorney's office as the beginning of the relevant investigation, contends that the State failed to establish that the defendant orchestrated the disposal of the motorcycle frame and engine "knowing that an investigation or official proceeding is pending or in progress" because the proof established that the investigation into the disappearance of the motorcycle actually did not begin until after Ms. Hernandez disposed of the items. This argument,

-17-

however, overlooks the fact that the investigation into the disappearance of Mr. Crisp's motorcycle actually began when Mr. Crisp telephoned 9-1-1 to report that the motorcycle had been stolen. Although the evidence suggests that the filing of the police report in this case was simply part of a ruse to defraud the insurance company, the fact remains that the objective purpose of reporting a theft of property to the police is to cause the police to investigate that theft. Once the report of the theft was duly filed with the CPD, the investigation into the theft of the motorcycle was "pending," regardless of whether it was actually "in progress." Using the filing of the police report as the triggering mechanism, we easily conclude that the State established that the defendant knew that an investigation had begun at the time he urged Ms. Hernandez to act.

The defendant also contends that the evidence was insufficient to support his conviction of evidence tampering because the State failed to introduce sufficient evidence to corroborate the testimony of Ms. Hernandez, who, he says, was clearly an accomplice in the case.

It is well settled "that a conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense." *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001) (citing *State v. Stout*, 33 S.W.3d 531 (Tenn. 2001); *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *Monts*, 379 S.W.2d at 43). Indeed, "[w]hen the only proof of a crime is the uncorroborated testimony of one or more accomplices, the evidence is insufficient to sustain a conviction as a matter of law." *State v. Jones*, 450 S.W.3d 866, 888 (Tenn. 2014) (citing *State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013) (citing *State v. Little*, 402 S.W.3d 202, 211-12 (Tenn. 2013)). By way of explanation, our supreme court has stated:

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bane*, 57 S.W.3d at 419 (quoting *Bigbee*, 885 S.W.2d at 803); *see also State v. Fowler*, 373 S.W.2d 460, 463 (Tenn. 1963).

Ms. Hernandez testified that the defendant came to her in August 2015 and asked her to dispose of a motorcycle frame and engine. She said that the defendant scratched at the VIN on the motorcycle frame with a razor blade. She then took the frame and the engine and tossed them off the side of a mountain. Ms. Hernandez admitted that she suspected that the items were stolen because the defendant had asked her to make them disappear. When she began to suspect that she might be blamed for the theft, Ms. Hernandez telephoned the district attorney's office to report what she had done along with the exact location of the items. Using the directions provided by Ms. Hernandez, Sergeant Clower found the motorcycle frame exactly where Ms. Hernandez said it would be. Though not completely obliterated, the VIN bore evidence of scratch marks. Sergeant Clower used that VIN to determine that the frame belonged to the motorcycle that Mr. Crisp had reported stolen two years earlier. The defendant, who was a friend of Mr. Crisp's, responded to Mr. Crisp's 9-1-1 call. The defendant was the only common factor between the reported theft of the motorcycle and the wanton disposal of the frame by Ms. Hernandez. Under these circumstances, we conclude that the evidence was sufficient to corroborate Ms. Hernandez's testimony and to support the defendant's conviction of evidence tampering.

## B. Initiating a False Police Report and Filing a Fraudulent Insurance Claim

As charged in this case, "[i]t is unlawful for any person to . . . [i]nitiate a report or statement to a law enforcement officer concerning an offense or incident within the officer's concern knowing that . . . [t]he offense or incident reported did not occur." T.C.A. § 39-16-502(a)(1)(A).

> Any person who intentionally presents or causes to be presented a false or fraudulent claim, or any proof in support of such claim, for the payment of a loss, or other benefits, upon any contract of insurance coverage, or automobile comprehensive or collision insurance, or certificate of such insurance or prepares, makes or subscribes to a false or fraudulent account, certificate, affidavit or proof of loss, or other documents or writing, with intent that the same may be presented or used in support of such claim, is punished as in the case of theft.

*Id.* § 39-14-133.

-19-

"A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." *Id.* § 39-11-401(a).

> A person is criminally responsible for an offense committed by the conduct of another, if:
>
> . . . .
>
> (2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense; or
>
> (3) Having a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist its commission, the person fails to make a reasonable effort to prevent commission of the offense.

*Id.* § 39-11-402(2)-(3).

In this case, the evidence adduced at trial, in the light most favorable to the State, established that when Mr. Crisp relayed to the defendant his difficulty in selling his motorcycle, the defendant, who worked as a police officer and also owned an interest in a body shop, told Mr. Crisp that he could make the motorcycle disappear. The defendant told Mr. Crisp to leave the motorcycle at the defendant's body shop on a day when the defendant was on duty as a police officer. He instructed Mr. Crisp to wait a bit and then report the motorcycle stolen, and the defendant would respond to the call. According to Mr. Crisp, he did as the defendant suggested, and the defendant responded to the 9-1-1 call that Mr. Crisp placed on August 2, 2013. The 9-1-1 recording and the CAD report corroborated Mr. Crisp's account that the defendant alone responded to the call, despite that Officer Criddle's name appeared on the police report. Officer Criddle testified, and CPD employee records verified, that Officer Criddle was off duty on August 2, 2013. After making the report and at the defendant's suggestion, Mr. Crisp filed an insurance claim for the loss of the motorcycle. Based upon this claim, GEICO insurance paid in excess of $8,000 to the lienholder. In our view, this evidence was sufficient to support both of the defendant's remaining convictions.

*VII. Sentencing*

In his final claim, the defendant challenges the propriety of the sentence imposed in this case, arguing that the trial court erred by (1) denying judicial diversion, (2) not declaring him an especially mitigated offender, (3) enhancing his sentence based upon the abuse of a position of public trust, and (4) denying alternative sentencing for the defendant's convictions of filing a false police report and filing a fraudulent insurance claim. The State asserts that the trial court did not err.

At the sentencing hearing, CPD Chief Mark Gibson testified that the defendant's arrest and conviction had had a negative impact on the department's daily operations as well as its reputation within the community. He said that the corresponding erosion of public trust made it difficult to be an effective police department. Chief Gibson said that rival factions arose in the department, causing conflicts between those officers who believed that the defendant was guilty and those who believed the defendant was innocent. Those conflicts led to a drop in officer morale.

At the conclusion of the sentencing hearing, the trial court imposed sentences of three years for each of the defendant's convictions and ordered that all the sentences be served concurrently. The court further ordered the defendant to serve the three-year sentences imposed in counts three and four in confinement and the three-year sentence in count five to be served on probation.

Our standard of review of the trial court's sentencing determinations in this case is whether the trial court abused its discretion, but we apply a "presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 706 n.41 (citing T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709.

## A. Judicial Diversion

"Judicial diversion" is a reference to the provision in Tennessee Code Annotated section 40-35-313(a) for a trial court's deferring proceedings in a criminal case. *See* T.C.A. § 40-35-313(a)(1)(A). Pursuant to such a deferral, the trial court places the defendant on probation "without entering a judgment of guilty." *Id.* To be eligible or "qualified" for judicial diversion, the defendant must plead guilty to, or be found guilty of, an offense that is not "a sexual offense or a Class A or Class B felony," and the defendant must not have previously been convicted of a felony or a Class A misdemeanor. *Id.* § 40-35-313(a)(1)(B)(i)(b), (c). Diversion requires the consent of the qualified defendant. *Id.* § 40-35-313(a)(1)(A). "[A] 'qualified' defendant is not necessarily entitled to diversion. Whether to grant judicial diversion is left to the discretionary authority of the trial courts." *State v. King*, 432 S.W.3d 316, 326 (Tenn. 2014). Following a determination that the defendant is eligible for judicial diversion, the trial court must consider

> (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, and (f) the deterrence value to the accused as well as others. The trial court should also consider whether judicial diversion will serve the ends of justice—the interests of the public as well as the accused.

*Id.* (quoting *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996)). "Further, the trial court must weigh the factors against each other and place an explanation of its ruling on the record." *King*, 432 S.W.3d at 326 (citing *State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998)).

Although judicial diversion is not a sentence, our supreme court determined that the standard of review first expressed in *State v. Bise*, applies to "appellate review for a trial court's sentencing decision to either grant or deny judicial diversion." *King*, 432 S.W.3d at 325. Importantly, however, the court emphasized that the adoption of the *Bise* standard of review "did not abrogate the requirements set forth in *Parker* and *Electroplating*, which are essential considerations for judicial diversion." *King*, 432 S.W.3d at 326.

The trial court need not provide a recitation of all the applicable "factors when justifying its decision on the record in order to obtain the presumption of reasonableness," but "the record should reflect that the trial court considered the *Parker* and *Electroplating* factors in rendering its decision and that it identified the specific

factors applicable to the case before it." *King*, 432 S.W.3d at 327. When the trial court considers each of the factors enumerated in *Parker* and weighs them against each other, placing its findings in the record, as required by *Electroplating, Inc.*, we "apply a presumption of reasonableness," per *Bise*, and will "uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision." *Id.* When "the trial court fails to consider and weigh the applicable common law factors, the presumption of reasonableness does not apply and the abuse of discretion standard . . . is not appropriate." *Id.* Instead, "the appellate courts may either conduct a de novo review or, if more appropriate under the circumstances, remand the issue for reconsideration. The determination as to whether the appellate court should conduct a de novo review or remand for reconsideration is within the discretion of the reviewing court." *Id.* at 328.

Here, the trial court determined that the defendant's "social, physical history, his willingness and ability to be a law abiding citizen in the past" should "make him amenable to correction" and would support a grant of judicial diversion. The court nevertheless rejected the defendant's request for judicial diversion, focusing on the defendant's amenability to correction and noting that, although the defendant had no criminal record and had "served with distinction" for "the overwhelming majority" of his adult life, his actions indicated a sustained intent to violate the law. The court also observed that there was a need for deterrence, finding that Chief Gibson's testimony established that the defendant's actions had contributed to "the public mistrust of law enforcement" in Cleveland. Addressing the circumstances of the offense, the trial court found the defendant's actions to be more reprehensible than if they had been committed by a member of the general public, observing that the defendant should be held to a higher standard because he was a police officer and that his sentence was "necessary to make a statement to other officers." Finally, the court observed that the defendant's lack of remorse negatively impacted his amenability to correction and, thus, militated against a grant of judicial diversion.

Although the trial court did not provide an exact recitation of all the applicable "factors when justifying its decision on the record," the record certainly reflects that the court considered each of the factors enumerated in *Parker*, that the court weighed those factors against each other, and that the court placed sufficient findings in the record as required by *Electroplating, Inc.* *See King*, 432 S.W.3d at 327. Accordingly, we "apply a presumption of reasonableness" to the denial of judicial diversion in this case. *See id.* Upon our review, we conclude that the record contains "substantial evidence to support the trial court's decision" and affirm the denial. The record supports the trial court's conclusion that the defendant's lack of candor and refusal to accept responsibility reflected poorly on his amenability to correction and that a need for general and specific deterrence existed in the community. The record also supports a

-23-

determination that these factors outweighed each of the factors in favor of a grant of diversion.

## B. Especially Mitigated Offender

"The court may find the defendant is an especially mitigated offender, if . . . [t]he defendant has no prior felony convictions; and . . . [t]he court finds mitigating, but no enhancement factors." T.C.A. § 40-35-109(a). In this case, the court rejected the defendant's request to be declared an especially mitigated offender because it concluded that two enhancement factors applied to the defendant's convictions. Specifically, the court determined that the defendant was a leader in the commission of the offenses, *see id.* § 40-35-114(2), and that the defendant abused a position of public trust, *see id.* § 40-35-114(14).

The record supports the application of both enhancement factors. The record establishes that it was the defendant who concocted the scheme to defraud Mr. Crisp's insurance company and who directed Ms. Hernandez to dispose of the motorcycle frame and engine as the final, culminating act of making Mr. Crisp's motorcycle "disappear." The record also establishes that the defendant exploited his position as a police officer by ensuring that he would be the officer to respond to Mr. Crisp's 9-1-1 call and by falsifying his report of that offense by putting Officer Criddle's name on it. Because the record supports the application of two enhancement factors, the trial court correctly determined that the defendant was not an especially mitigated offender.

## C. Enhancement

As mentioned in the previous section, the trial court utilized abuse of a public trust as a sentence enhancement factor. *See* T.C.A. § 40-35-114(14). As we noted, the record supports the application of this factor.

## D. Manner of Service

The imposition of three-year sentences in this case mandated the trial court's considering probation as a sentencing option. *See* T.C.A. § 40-35-303(a), (b). Traditionally, the defendant has borne the burden of establishing his "suitability for full probation." *State v. Mounger*, 7 S.W.3d 70, 78 (Tenn. Crim. App. 1999); *see* T.C.A. § 40-35-303(b). Such a showing required the defendant to demonstrate that full probation would "subserve the ends of justice and the best interest[s] of both the public and the defendant." *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990) (quoting *Hooper v. State*, 297 S.W.2d 78, 81 (1956), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 9-10 (Tenn. 2000)).

To be eligible for community corrections placement, an offender must "meet[] all of the following minimum criteria":

(A) Persons who, without this option, would be incarcerated in a correctional institution;

(B) Persons who are convicted of property-related or drug-or alcohol-related felony offenses or other felony offenses not involving crimes against the person as provided in title 39, chapter 13, parts 1-5;

(C) Persons who are convicted of nonviolent felony offenses;

(D) Persons who are convicted of felony offenses in which the use or possession of a weapon was not involved;

(E) Persons who do not demonstrate a present or past pattern of behavior indicating violence; and

(F) Persons who do not demonstrate a pattern of committing violent offenses.

T.C.A. § 40-36-106(a)(1). Even when an offender does not meet the above criteria, he or she may nevertheless "be considered eligible for punishment in the community under this chapter" if the offender "would be usually considered unfit for probation due to histories of chronic alcohol or drug abuse or mental health problems, but whose special needs are treatable and could be served best in the community rather than in a correctional institution." *Id.* § 40-36-106(c).

When a trial court orders confinement and therefore rejects any form of alternative sentencing such as probation, split confinement, or periodic confinement, it must base the decision to confine the defendant upon the considerations set forth in Code section 40-35-103(1), which provides:

(1) Sentences involving confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

-25-

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant; . . . .

T.C.A. § 40-35-103(1).

As to the manner of service of the sentence, the trial court again pointed specifically to the defendant's lack of remorse as evidenced by his statement in the presentence report, which the court classified as "disturbing" and "difficult to read," and stated that it negatively impacted the defendant's amenability to correction. The court found that confinement was necessary to avoid depreciating the seriousness of the offense, classifying the defendant's use of his position as a police officer to commit the crimes to be "specifically shocking, reprehensible, and offensive," and that this case was particularly suited to provide deterrence to other, similarly-situated individuals. The court determined, however, that these findings applied only to the defendant's convictions of initiating a false police report and filing a false or fraudulent insurance claim. Based upon these findings, the trial court ordered the defendant to serve the three-year sentences imposed in counts three and four in the Department of Correction and the three-year sentence in count five to be served on probation.

"If the seriousness of the offense forms the basis for the denial of alternative sentencing," then "the circumstances of the offense as committed must be especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree, and the nature of the offense must outweigh all factors favoring a sentence other than confinement." *State v. Trotter*, 201 S.W.3d 651, 654 (Tenn. 2006) (citations and internal quotation marks omitted). The circumstances of the offenses in this case cannot be classified as violent, horrifying, offense, excessive, or exaggerated, but, as the trial court observed, they can be described as shocking, offensive, or reprehensible. The defendant, a police officer sworn to uphold the law, not only broke the law but also used his position as a police officer to do so. He manipulated the system in a way that broke the public trust. Additionally, the record supports the trial court's finding of a need for deterrence to similarly-situated individuals based upon the testimony provided by Chief Gibson.

*Conclusion*

Based upon the foregoing, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE